UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MARY A. NESHEIWAT,

                                        Plaintiff,

        v.                                                      5:10-CV-937
                                                                  (FJS/ATB)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                                        Defendant.

_____

HOWARD D. OLINSKY, ESQ., for Plaintiff
BENIL ABRAHAM, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

        This matter was referred to me for report and recommendation by the Honorable

Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636

(b) and Local Rule 72.3(d).  This case has proceeded in accordance with General

Order 18.

## I.      PROCEDURAL HISTORY

        Plaintiff filed[1] an application for disability insurance benefits and Supplemental

Security Income (SSI) on July 17, 2007, claiming disability since October 31, 2005.

(Administrative Transcript ("T.") at 111–13).  Plaintiff's applications were denied

---

        [1] In his decision, the Administrative Law Judge (ALJ) stated that plaintiff "protectively filed"
her application on March 28, 2007.  (T. 11).  When used in conjunction with an "application" for
benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been
filed with the Social Security Administration, indicating the claimant's intent to file a claim for
benefits.  *See* 20 C.F.R. § 416.340.  There are various requirements for this written statement.  *Id.*  If a
proper statement is filed, the Social Security Administration will use the date of the written statement
as the filing date of the application even if the formal application is not filed until a future date.

initially on November 9, 2007.  (T. 64–68).  Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (T. 69).  The hearing, at which plaintiff testified, was conducted on September 16, 2009.  (T. 27–62).

In a decision dated January 14, 2010, the ALJ found that plaintiff was not disabled.  (T. 11–21).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on June 23, 2010.  (T. 1–5).

## II.   ISSUES IN CONTENTION

The plaintiff makes the following claims:

1.   The ALJ failed to meet his affirmative duty to develop the record.  (Pl.'s Brief at 11–15; Dkt. No. 11).

2.   The ALJ erred by finding plaintiff's degenerative disc disease and obsessive compulsive disorder to be non-severe.  (Pl.'s Brief at 15–17).

3.   Plaintiff's impairments meet the criteria of Listing 11.02A.  (Pl.'s Brief at 17–19).

4.   The ALJ's residual functional capacity (RFC) finding is the product of legal error because he did not provide function-by-function findings regarding plaintiff's exertional limitations or include plaintiff's nonexertional limitations in the RFC.  (Pl.'s Brief at 19–21).

5.   The ALJ failed to follow the treating physician rule, which rendered his RFC finding unsupported by substantial evidence.  (Pl.'s Brief at 21–23).

6.   The ALJ failed to apply the appropriate legal standards in evaluating plaintiff's credibility.  (Pl.'s Brief at 23–24).

7.   The commissioner failed to meet his burden at step 5 to show, based on substantial evidence, that a significant number of jobs exists in the national economy that plaintiff could perform and to which she could be expected to make a vocational adjustment.  (Pl.'s Brief at 24–25).

2

Defendant has filed a brief in opposition to plaintiff's arguments.  (Dkt. No. 14).

For the following reasons, this court finds that the Commissioner's decision is

supported by substantial evidence and will recommend that plaintiff's complaint be

dismissed.

## III.   APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or

SSI disability benefits must establish that he is "unable to engage in any substantial

gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months . . . ."  42

U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. § 404.1520

and in § 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work
> activities.  If the claimant suffers such an impairment, the third inquiry is

3

whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps. *Id.*  However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams*, 859 F.2d at 258.  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision.  *Id.  See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## IV.   MEDICAL EVIDENCE

On July 17, 2006, plaintiff reported to Community General Hospital Emergency Room after apparently suffering a seizure and also complained of abdominal pain and persistent diarrhea.  (T. 270).  Plaintiff reported that she suffered about fifteen seizures per month, even though she claimed that she was taking her medications as prescribed.  (T. 270–71).

5

Plaintiff was admitted to St. Joseph's Hospital on August 4, 2006, complaining of abdominal pain that had worsened over the previous three weeks.[2]  (T. 234). Plaintiff was initially diagnosed with acute colitis, which, after a colonoscopy on August 6, 2006, was attributed to infectious diarrhea.  (T. 235–36).  Dr. Borys Buniak noted in a report dated August 9, 2006, that plaintiff's lithium and phenobarbital levels were "negligible."  (T. 226).  In a report dated August 10, 2006, Dr. Sabine Meyer noted plaintiff's bipolar disorder, for which she was prescribed lithium.  (T. 228).  Dr. Meyer also found that plaintiff's lithium level was nondetectable.  (T. 228). Plaintiff told Dr. Meyer that she had not taken her lithium because she was in "too much pain."  (T. 228).  Dr. Meyer attributed some of plaintiff's irritable mood, which Dr. Meyer interpreted as plaintiff experiencing a depressive episode, to plaintiff being "off her medications for a while."  (T. 229).  Dr. Meyer also noted plaintiff's history of street drug use and plaintiff's apparent remission for years, but remarked that plaintiff "continues to be on controlled substances such as Clonazepam, therefore, I would call her remission only partial."  (T. 228).  In plaintiff's discharge summary, Dr. Buniak noted that plaintiff's "bipolar disorder became exacerbated by her refusal to take medications."  (T. 224).

In an addendum to a medical report from the Upstate University Medical Center Emergency Room, Dr. Gary A. Johnson reported that plaintiff stated she had been taking her medications "intermittently over the past couple of months," and "she last

---

[2] The court notes that three weeks prior to August 4 is July 14, which is approximately the time plaintiff was in the Community General Hospital Emergency Room complaining of abdominal pain and persistent diarrhea.

saw her primary care physician three months ago and that she has had difficulty affording her prescriptions and has been taking half doses of some of them and full doses of others." (T. 290).

Plaintiff saw neurologists at CNY Neurology from September 25, 2006, to January 18, 2007. (T. 192–201). Dr. Enrique Wulff noted in his report dated September 25, 2006, that plaintiff stated that she had been having generalized seizures almost weekly for the previous few months. (T. 192). Plaintiff told the doctor that she had suffered a seizure the night before, but by 3:00 p.m. the following day had not yet taken her medication prescribed for her seizure disorder. (T. 192). At the time, plaintiff was prescribed 300 mg of Dilantin per day. (T. 192). On October 1, 2006, plaintiff visited the emergency room of Community General Hospital after suffering a seizure. (T. 266). After someone from the emergency room called plaintiff's neurologist to inform him of plaintiff's low serum levels of phenytoin (Dilantin), plaintiff's Dilantin dosage was increased at the neurologist's directive. (T. 266–67). In Dr. Wulff's October 2, 2006, report, he noted plaintiff's "poor compliance with medications." (T. 195). Dr. Wulff increased plaintiff's Dilantin prescription to 400 mg per day. (*See* T. 196).

Plaintiff suffered a seizure at Community General Hospital on October 5, 2006, while she was visiting a patient there. (T. 197). After plaintiff was taken to the emergency room, and her Dilantin level was measured, she went to see Dr. Wulff. (T. 197). He noted plaintiff's low Dilantin level that was measured in the ER immediately following her seizure and that the ER had given her a replacement dose. (T. 197). He

explained to plaintiff and her relatives "the importance of good compliance with the medications."  (T. 197).  The Emergency Department Report indicated "seizures secondary to inadequate serum concentrations of anticonvulsives."  (T. 264). Plaintiff's phenytoin (Dilantin) level on October 9, 2006, was still only 4.9.[3]  (T. 342). Plaintiff reported to Upstate Medical Center Emergency on October 16, 2006, after suffering another seizure two days before.  (T. 285).  Plaintiff's Dilantin level was "slightly subtherapeutic" at 6.5.  (T. 287).

In an Emergency Department Report from Community General Hospital dated January 7, 2007, Dr. Michael Shaw noted that plaintiff refused to have a CT scan of her brain, even when he explained that without it, he would be unable to diagnose any head injury resulting from her recent seizure.  (T. 255).  Dr. Shaw also remarked that there had apparently been some confusion with plaintiff's medications, and she had failed to take them for almost a week.  (T. 255).  Dr. Shaw concluded that her seizures were due to noncompliance with her medication.  (T. 255).  On January 11, 2007, Dr. Francisco Gomez, also with CNY Neurology, stated that when plaintiff had visited the ER on January 7, 2007, her Dilantin level was "subtherapeutic at 2.1," but that plaintiff claimed that she was taking her medication.  (T. 198; *see also* T. 346). Plaintiff told Dr. Gomez that many years prior, her seizures were under good control with Dilantin and phenobarbital, which prompted a "taper" of those medications.  (T. 198).  However, her current prescription of Dilantin was for 600 mg per day.  (*See* T. 198).  Dr. Gomez ordered a blood test to measure the levels of Dilantin and

---

[3] According to the lab report from Laboratory Alliance of Central New York, the "normal" therapeutic level for phenytoin (Dilantin) is 10.0–20.0 MCG/ML.  (T. 346).

phenobarbital, but when plaintiff returned on January 18, 2007, the test had not been completed.  (T. 200).  Dr. Gomez told plaintiff that he needed the blood tests to determine her next medication adjustment, and thus could not recommend further adjustments.  (T. 200).

On January 19, 2007, plaintiff saw Dr. Syed Gardezi at the Syracuse Community Health Center, who noted that Dr. Gomez had prescribed Dilantin and phenobarbital.  (T. 212).   Dr. Augustin, from Syracuse Community Health Center, also saw plaintiff on January 19, 2007, and noted that plaintiff's Dilantin level was less than three.  (T. 211; *see also* T. 349).  On February 1, 2007, Dr. Gardezi stated that "[a]s usual she has a massive social crisis on her hands," because her purse, containing her medications, passport, and identification had been stolen.  (T. 210). Dr. Gardezi refilled most of her prescriptions, but told her that he "[would] not refill her narcotics before the time is up."  (T. 210).

Plaintiff's social problems continued throughout February.  As Dr. Gardezi noted on February 22, 2007, "There does not appear to be any means of treating her medical issues as everytime [sic] she shows up she has a huge psychosocial event in her life."  (T. 209).  Plaintiff told Dr. Gardezi that her husband had taken her narcotics and anxiety medication.  (T. 209).  Plaintiff visited the Upstate University Medical Center Emergency Room on March 10, 2007, complaining of lower back pain related to an alleged assault when her ex-husband kicked her repeatedly in the back.  (T. 284). Plaintiff was taken to St. Joseph's Hospital, where she was treated for fractures in her hand.  (T. 284).  At Upstate Medical Center, plaintiff was given Lortab for her back

pain and relaeased.  (T. 285).  When plaintiff met with Dr. Gardezi on March 20, 2007, he indicated that plaintiff reported that she was taking her seizure medications, and no problems were noted related to her seizures.  (T. 208).  However, on April 18, 2007, Dr. Gardezi noted that Dr. Gomez had refused to treat plaintiff any more due to her noncompliance with medication and his direction.  (T. 207).

Plaintiff had an x-ray of her lumbosacral spine on May 7, 2007, which revealed "mild degenerative changes," but no acute findings.  (T. 223).  On May 15, 2007, plaintiff was complaining of pain in her left leg, for which Dr. Gardezi ordered an MRI of her knee.  (T. 206).  He also noted that plaintiff's seizures were "controlled." (T. 206).  An x-ray of plaintiff's lumbosacral spine, taken on June 9, 2007, was normal, with "mild narrowing of the L5-S1 interspace."  (T. 222).

On June 13, 2007, plaintiff again saw Dr. Gardezi, who noted that plaintiff had still not had an MRI scan of her knee, and remarked, "I suspect [plaintiff] is avoiding the MRI because it might be normal."  (T. 205).  On June 18, 2007, plaintiff was seen in the Community General Hospital Emergency Room after she apparently fell down five to ten stairs.  (T. 251).  X-rays revealed a right ring fracture, and plaintiff was diagnosed with back strain and contusion.  (T. 252).  A CT scan done on June 30, 2007, showed no acute abnormality in plaintiff's lumbar spine.  (T. 249).  On June 29, 2007, plaintiff reported to Dr. Anne Calkins of the Community General Hospital Emergency Room that she had not had a seizure "in some time."  (T. 246).

Plaintiff went to Upstate Medical Center Emergency Room on July 2, 2007, two days after suffering another seizure.  (T. 278).  Plaintiff reported that she had failed to

take her Dilantin or phenobarbital the day she had the seizure, but began taking her medication afterward.  (T. 279).  However, tests showed that her Dilantin level was subtherapeutic, and she was given Dilantin in the emergency department.  (T. 279).  In the Emergency Department Consultation from Upstate Medical Center, also dated July 2, 2007, Dr. Tariq Mahmood stated that plaintiff "admitted that she missed 4 doses of Dilantin and phenobarbitone 3–4 days back."  (T. 280).  Plaintiff told Dr. Mahmood that her last seizure was about two and a half months prior.  (T. 280).  Dr. Mahmood reported plaintiff's seizure was the result of noncompliance with her antiseizure medications. (T. 281).

Plaintiff had an MRI of her knee done prior to her next appointment with Dr. Gardezi on July 13, 2007.  The MRI was normal, but an MRI of her back revealed moderate annular bulges in two disk spaces, although the bulges were not compressing any nerves.  (T. 204).  Dr. Gardezi also noted that, as he suspected, plaintiff was still not taking her seizure medications, because her Dilantin levels were "undetectable," even though she reported that she was taking all her medications.  (T. 204).

Plaintiff was admitted to Community General Hospital Emergency Room on July 29, 2007, after suffering another seizure.  (T. 239).  Dr. Karen Sebastian stated that plaintiff's phenobarbital level was therapeutic at 39.5, and her phenytoin (Dilantin) level was therapeutic at 16.5.  (T. 239).  One month later, on August 27, 2007, Dr Gardezi noted that plaintiff had been discharged from St. Joseph's on August 22, after she was admitted there for observation.  (T. 203).  Dr. Gardezi refilled

plaintiff's medication, again noting that while she reported that she was taking her medications regularly, "the last time Dilantin and phenobarbital levels were checked they were low." (T. 203).

On December 21, 2007, plaintiff saw Dr. Gardezi, who noted that plaintiff reported having two seizures in December. (T. 356). On December 22, 2007, plaintiff's Dilantin and lithium levels were both low, as indicated on the University Hospital medical report. (T. 350).

## V.    **Non-Medical Evidence and Testimony**

Plaintiff testified that she has received no formal vocational training, and the last grade she completed was the seventh grade. (T. 31). She has not received a GED. (T. 30). Plaintiff testified that, on a normal day, after going to bed at 2:00 or 3:00 a.m., she would get up around 5:00 a.m. and watch television or start walking around. (T. 37–38). Around 8:00 a.m., she would eat and take her medications. (T. 38). At the time of the hearing, plaintiff was separated from her husband and had just obtained an apartment. (T. 30). Before she was separated from her husband, plaintiff would take her dogs out in the morning before showering and preparing something to eat. (T. 39).      Plaintiff testified that before June 30, 2006, she was able to bathe, groom, and dress herself. (T. 40). She was able to cook simple meals and do her own grocery shopping. (T. 40). Plaintiff testified that she did the laundry, dishes, and vacuumed. (T. 41). Her hobbies at the time were quilting and liquid embroidery.[4] (T. 41).

---

[4] The transcript states "liquid and burnering (sic)." The court assumes the plaintiff said "liquid embroidering," and was poorly heard by the transcriptionist. From plaintiff's description that it is "just something you do to make pictures like on a pillowcase," it appears plaintiff was referring to liquid embroidery, a craft where one uses paints to embellish fabric and other materials.

Plaintiff testified that her bipolar disorder and obsessive compulsive disorder prevent her from sitting still or concentrating, and that her hands shake.  (T. 42).

In 2005 and 2006, plaintiff belonged to a church that she attended three times per month, and she testified that she did not have any problems getting along with people there.  (T. 45).  Plaintiff testified that in 2005 to 2006 she could lift five to ten pounds, but would be unable to walk "a lot."  (T. 47).  She also testified that she would have been able to sit for an hour and a half.  (T. 48).  Plaintiff testified that at one time, she drank alcohol in the form of vodka in the amount of a gallon every day or two, and used heroin, crack, cocaine, and marijuana.  (T. 48–49).  Plaintiff testified that she has since quit drinking alcohol and using drugs.  (T. 49).  Plaintiff was unable to recall the exact period of time she was drinking and using drugs.  (T. 48–49).

## VII.  **ALJ's Decision**

The ALJ found that plaintiff met the insured status requirement until June 30, 2006.  (T. 13).  Plaintiff claims that her disability began on October 31, 2005, and, although she worked after this alleged disability onset, the ALJ found that the work did not rise to the level of substantial gainful activity.  *Id.*  The ALJ found that plaintiff had Epilepsy, Seizure Disorder, and Bipolar Disorder, all of which the ALJ considered "severe" impairments.  *Id.*  The ALJ found that none of plaintiff's impairments, singly or in combination, rose to the severity of a "Listed Impairment."  (T. 14).

The ALJ then considered plaintiff's residual functional capacity (RFC) and found that plaintiff has the RFC to perform light work, but limited to unskilled work

that does not involve driving.  (T. 16).  Plaintiff can never climb ladders, ropes, or scaffolds and must avoid exposure to all hazards.  (T. 16).  The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but the ALJ found that plaintiff's statements regarding the intensity, persistence, and limiting effects of the alleged symptoms were not credible to the extent they were inconsistent with the RFC assessment.  (T. 16, 18).

Because the ALJ found that plaintiff's ability to perform the full range of unskilled, light work was significantly limited by her nonexertional impairments, the ALJ called a vocational expert to testify.  (T. 20).  The vocational expert testified that an individual with plaintiff's limitations would be able to perform the requirements of an Assembler, Laundry Worker, and Packer, and that 400,000 Light, Unskilled, and 90,000 Sedentary, Unskilled jobs existed in the New York State Region.  (T. 20).  Based on the testimony of the vocational expert, the ALJ thus found that plaintiff was not disabled. (T. 20–21).

## VII.   ANALYSIS

### 1.    The ALJ's Duty to Develop the Record

Plaintiff argues that the ALJ should have requested records from St. Joseph's Hospital Health Center Comprehensive Psychiatric Emergency Program (CPEP) and Dr. Spencer from Hutchings.  (Pl.'s Mem. of Law 12–13).  Plaintiff also argues that the ALJ should have ordered a consultative psychiatric or medical examination.  (Pl.'s Mem of Law 13).

The ALJ in a Social Security hearing is obligated to affirmatively develop the

record, unlike a judge at a trial.  *Echevarria v. Secretary of Health & Human Services*, 685 F.2d 751, 755 (2d Cir. 1982).  "Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."  *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  This obligation to fill gaps in the administrative record exists even when a claimant is represented.  *Umansky v. Apfel*, 7 Fed. Appx. 124, 127 (2d Cir. 2001) (citations omitted).  However, the duty to investigate further is not absolute, and it depends on the record before the ALJ.  *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998).

Plaintiff states that two reports, completed at the end of October 2007, gave the ALJ notice that additional medical records from CPEP existed.  (Pl.'s Mem. of Law 12).  One record is from Crouse Hospital Chemical Dependency Treatment Services, and it states, "CPEP - 2 Xs - Last hospitalization about 6 weeks ago."  (T. 300).  That would only indicate that plaintiff was at CPEP earlier in October 2007.  The other record is entitled HelpPeople DSS Mental Health Assessment, and states, "Reports multiple CPEP admissions with most recent admission approximately one month ago." (T. 308).  Again, this record only mentions that plaintiff's latest treatment at CPEP was in late 2007.   Neither document indicates that any CPEP records existed that reflected plaintiff's condition during the period prior to the expiration of her insured status on June 30, 2006.  In addition, plaintiff's undated "Disability Report - Appeal" states, "since 09/07 been to CPEP about 5 times, referred to outpatient."  (T. 157). About two weeks prior to the hearing with the ALJ, plaintiff requested help in obtaining CPEP records from January 2007 through the current date.  (T. 168).

Plaintiff's attorney discussed the CPEP records with the ALJ at the hearing.  (T. 51–52).  The attorney stated that there were records from 2007, and "probably records before that."  (T. 51).  The ALJ indicated that records prior to the expiration of her insured status were the only relevant records, and stated "I'm going to ask for records prior to the date last insured because I don't think after that's going to help."  (T. 52). Apparently, the ALJ's request was unsuccessful, because the ALJ explained in his opinion that he "attempted to obtain additional hospital records relating to the period before the date last insured but was unsuccessful."  (T. 52).  In light of the above-mentioned records, it is doubtful that there were any records from CPEP pertaining to the period prior to the Date Last Insured.  The failure to obtain additional records was not because the ALJ did not attempt to develop the record, but because there appear to be no additional records relating to the relevant period.

Dr. Spencer is only mentioned twice in the record.  Dr. Spencer is mentioned in a treatment note dated August 8, 2006.  (T. 228–29).  The treatment note indicates the plaintiff reported that she was in treatment with Dr. Spencer at Hutchings Psychiatric Center Outpatient Center (Hutchings) for her bipolar disorder.  (T. 228).  However, the HelpPeople DSS Mental Health Assessment dated October 25, 2007, indicates that plaintiff reported that her treatment with Dr. Spencer ended approximately two years prior, which would likely have been before the alleged onset date of October 31, 2005. (T. 308).  Plaintiff did not list Dr. Spencer in her Disability Report or her Disability Report Appeal, each of which instructed her to include "who may have medical records or other information about your illnesses, injuries, or conditions . . . ."  (T.

16

143, 156; *see also* T. 136–38, 140–49, 155–63).  Plaintiff did not mention Hutchings or Dr. Spencer at the hearing.  (*See* T. 27–62).  It appears unlikely that any records from Dr. Spencer or Hutchings would be helpful or relevant.

At the hearing, the ALJ stated that he was going to attempt to schedule a Psychiatric Consultative Examination of the plaintiff, but expressed concern about how much probative value it would provide, "because I don't know if he's going to be able to tell me anything about her prior to the date last insured . . ."  (T. 61).  The ALJ's decision states that after the hearing, the ALJ requested that the "State Agency" order a consultative psychiatric examination if the examination could result in an opinion of claimant's impairment prior to the expiration of her insured status.  (T. 18).  The ALJ then states that the State Agency "was not able to do so."  (T. 18).  Simply ordering an examination that could provide nothing relevant to the ALJ's determination would not have developed the record, and would only have served to delay the process.

As discussed above, the ALJ sought to develop the record, and the absence of medical records relating to the period prior to the expiration of her insured status from CPEP or Dr. Spencer does not indicate the contrary.  After a review of the record before the ALJ, this court finds that he met his obligation to develop the record by attempting to obtain additional records pertaining to the relevant time period, and by inquiring if a consultative psychiatric examination would provide additional relevant information.  Additionally, after learning that a consultative examination would not provide additional insight, the ALJ declined to order an examination that would

17

ultimately prove unhelpful.  Accordingly, plaintiff's claims based on a failure by the ALJ to develop the record should be dismissed.

### 2.   **Severe Impairments**

Plaintiff argues that the ALJ erred in determining that plaintiff's degenerative disc disease (DDD) and obsessive compulsive disorder (OCD) were not "severe" impairments.  The regulations define a "non-severe" impairment as one that does not *significantly limit* [the plaintiff's] physical or mental abilities to do basic work activities."  20 C.F.R. §§ 404.1521(a); 416.921(a) (emphasis added).  Basic work activities are defined as "abilities and aptitudes necessary to do most jobs."  *Id.* §§ 404.1521(b); 416.921(b).  These abilities are further defined as physical functions, including the capacity for seeing, hearing, and speaking.  *Id.* § 404.1521(b)(1); 416.921(b)(1).

These basic work activities also include mental capacities, such as understanding; carrying out and remembering simple instructions; as well as the use of judgment.  *Id.* §§ 404.1521(b)(3), (b)(4); 416.921(b)(3), (b)(4).  Also included as basic work activities are other mental capabilities, such as responding appropriately to supervision, co-workers, and usual work situations, and dealing with changes in a routine work setting.  *Id.* §§ 404.1521 (b)(2), (b)(5), (b)(6); 416.921(b)(2), (b)(5), (b)(6).

A finding of "not severe" may be made if the medical evidence establishes only a "slight abnormality" that would have "no more than a minimal effect on an individual's ability to work. *Rosario v. Apfel*, 1999 U.S. Dist. LEXIS 5621, *14, 1999

18

WL 295727 (E.D.N.Y. Mar. 19, 1999).  In *Dixon*, the Second Circuit noted that the "threshold severity test" should only be used as a screening device to eliminate *de minimis* claims. 54 F.3d 1030.  The issue in *Dixon*, however, was the ALJ's use of the "severity" test to deny claims without consideration of vocational factors.  *Id*. at 1031.  Here, the ALJ did not dismiss plaintiff's claim because she did not have a "severe" impairment, rather the ALJ made a full analysis of plaintiff's impairments, together with vocational factors.  The ALJ found that only two of plaintiff's impairments were not severe.

The record does not support plaintiff's claims that her DDD or OCD impairments are severe.  Plaintiff went to the emergency room on March 11, 2006, after a fall, which she reported resulted in injuries to her right knee and back.  (T. 296).  The physical examination revealed some right paraspinal tenderness, no obvious bone deformities, and no spinal tenderness.  (T. 296).  An x-ray of her lumbosacral spine and right knee showed no acute disease.  (T. 296).

Plaintiff points to two medical records from CNY Neurology, PLLC, dated October 2, 2006, and October 5, 2006, in which the doctor noted that her back range of motion was "decreased in all directions."  (T. 195, 197).  Both of these visits came within 24 hours of a seizure.  *Id.*  An x-ray report dated May 7, 2007, states "[s]ome disc space narrowing is noted at L5-S1 compatible with degenerative disease."  (T. 223).  About one month later, an x-ray taken of plaintiff's lumbosacral spine on June 9, 2007, revealed mild narrowing of the L5-S1 interspace, but was otherwise normal. (T. 222).  A report of an x-ray of plaintiff's lumbar spine taken on June 18, 2007,

indicated that the vertebral body heights and disc spaces were maintained.  (T. 254).

Later, a report of an x-ray of plaintiff's lumbar spine taken on June 30, 2007, indicated

no fracture, subluxation, or significant acute abnormality.  (T. 249).  By July 2007, an

MRI revealed that her lumbar spine was normal "except for the moderate annular

bulges in 2 disk spaces which are not compressing any nerves."  (T. 204).

The ALJ analyzed the record, and noted that the first mention of DDD was in

May 2007.  Plaintiff's other complaints of back pain and resulting treatment were after

falls or physical encounters with her ex-husband, as noted by the ALJ in his decision.

(T. 14; *see also* T. 205, 206, 296).   The ALJ is entitled to resolve evidentiary conflicts

and determine credibility issues.  *Stanton v. Astrue*, 370 Fed. Appx. 231, 234 (2d Cir.

2010); *Aponte v. Secretary of HHS*, 728 F.2d 588, 591 (2d Cir. 1984).  The ALJ

evaluated the evidence in the record, and substantial evidence existed to conclude that

plaintiff's back pain was related to seizures or other events in her life, and any DDD

that was present was not severe.  The ALJ was justified in finding that there was

insufficient evidence of DDD prior to the expiration of her insured status to conclude

that plaintiff's DDD was severe.  In addition, there is no indication that plaintiff's

alleged DDD caused any functional limitations prior to, or even after, the expiration of

her insured status.

Plaintiff's assertion that her OCD was severe is based on two medical records

dated October 2006, from CNY Neurology, PLLC.  (T. 194, 196).  Each record lists

"OCD" in her past medical history, but not as a diagnosis by the treating physician.

*Id.*  In addition, the medical records from CNY Neurology dated January 11 and 18,

2007, do not include OCD in plaintiff's past medical history.  (T. 198, 200).  There is

no other medical record indicating OCD as a diagnosis, and there is no record of

plaintiff receiving any treatment for OCD.  Finally, there is no evidence that plaintiff's

alleged OCD caused any functional limitations during the relevant period prior to the

expiration of her insured status.  The ALJ was justified in finding that plaintiff's OCD

was not severe.

### 3.    Listed Impairment

Plaintiff argues that the severity of her impairments rose to the level of Listing

11.02A.  Listing 11.02A requires a "grand mal or psychomotor epilepsy," that is

"documented by a detailed description of a typical seizure pattern . . . occurring more

frequently than once a month in spite of at least 3 months of prescribed treatment.

With: A. Daytime episodes."  20 C.F.R. Pt. 404, Subpt., App. 1, Listing 11.02A.

Plaintiff argues that she meets listing 11.02A, and cites medical records covering the

period from July 17, 2006, to October 11, 2007, as evidence.  (Pl.'s Br. 18).

In order to have a listed impairment under section 11.02A, the plaintiff must

meet both criteria of the Listing.  Plaintiff must have the requisite number of seizures,

notwithstanding at lease three months of prescribed treatment.  In this case, it is clear

from the record that the frequency of plaintiff's seizures is due to plaintiff's failure to

take her prescribed medications, evidenced by the documented Dilantin levels in her

blood.  Thus, the ALJ's finding that plaintiff's impairment does not rise to the severity

of a Listing is supported by substantial evidence.

The Community General Hospital Emergency Department Report dated July 17,

2006, a month after the expiration of her insured status, indicates that plaintiff reported that she was experiencing about 15 seizures per month. (T. 270). Three months later, another Community General Hospital Emergency Department Report dated October 1, 2006, indicated that plaintiff had suffered a seizure before coming to the emergency room and another seizure one to two weeks prior. (T. 266). The report also indicated that plaintiff's Dilantin level was 4.7, and after consulting plaintiff's neurologist, her evening Dilantin dosage was increased. (T. 267). A medical report dated October 2, 2006, from Dr. Wulff at CNY Neurology indicated "poor compliance with medications." (T. 195).

Plaintiff was admitted to the Community General Hospital Emergency Room four days later, on October 5, 2006, when she suffered a seizure while visiting her daughter, who was also in the hospital. (T. 264). The Emergency Department Report assessment was "seizures secondary to inadequate serum concentrations of anticonvulsives." (T. 264). The report also indicated that plaintiff claimed that she was taking her medications as prescribed. (T. 264). Plaintiff visited CNY Neurology after leaving the Community General Hospital Emergency Room, and the report again stated "poor compliance with medications," and that "we explained to the patient and all her relatives today the importance of good compliance with the medications." (T. 197).

Another Emergency Department Report from Community General Hospital dated January 7, 2007, indicates plaintiff suffered a seizure and gives a differential diagnosis of "seizures due to noncompliance." (T. 255). Apparently, plaintiff had

experienced some difficulties with her medication and had not taken her medication for almost an entire week. (T. 255). A report from her neurologist, Dr. Gomez, dated January 11, 2007, indicates that plaintiff had been followed by another doctor for her seizures, and that her Dilantin level was subtherapeutic. (T. 198). Plaintiff apparently failed to follow Dr. Gomez's directive to get lab work done, as he was unable to recommend further changes one week later, as indicated by his report dated January 18, 2007. (T. 200). Dr. Gomez indicated that if she continued to be noncompliant, he would be unable to help her, and she would need to find a different neurologist. (T. 201). This apparently occurred, because a Progress Note from the Syracuse Community Health Center dated June 13, 2007, states that Dr. Gomez had stopped seeing plaintiff "due to her noncompliance." (T. 205). This was also noted in a similar report dated April 18, 2007. (T. 207).

Plaintiff suffered another seizure at the end of January, as reported in the Syracuse Community Health Center Progress Note signed by Dr. Gardezi, who also stated that her Dilantin level was less than 3. (T. 211). In May 2007, a Progress Report from Syracuse Community Health Center indicated that plaintiff's seizures were "controlled at this point." (T. 206). After suffering another seizure in June 2007, plaintiff's Dilantin level was "only 4," and she received a replacement dose, as indicated on the Community General Hospital Emergency Department Report dated June 29, 2007. (T. 246). Plaintiff's Dilantin level was again mentioned in an Emergency Department Record dated July 2, 2007, which stated that plaintiff "was noncompliant with her medications on Friday but has since been compliant. She was

subtherapeutic on her Dilantin and did receive a Dilantin loading dose here in the emergency department." (T. 279). A Progress Note from Syracuse Community Health Center dated July 13, 2007, Dr. Gardezi states, "As I suspected she is not taking her antiseizure medications because the last time we checked her Dilantin levels were undetectable but she continues to say that she is taking all her medications." (T. 204). Plaintiff's noncompliance with medication continued to be a problem into the next year, as noted by Dr. Gardezi in a Progress Report from Syracuse Community Health Center dated January 17, 2008, "She says everytime [sic] she is taking the Dilantin but the blood tests show that she is not." (T. 357).

On June 29, 2007, plaintiff reported that she had not had a seizure for a long time, but Dr. Mahmood stated that on July 7, 2007, plaintiff experienced a seizure when she failed to take three to four doses of her medications. (T. 279–81). Although this occurred after the expiration of her insured status, this incident is further support for the ALJ's finding that plaintiff did not have a listed impairment. It is clear from the medical records that plaintiff was often noncompliant with the medication prescribed to prevent her seizures. Thus, the ALJ's finding that plaintiff did not meet a listed impairment is supported by substantial evidence, because she did not meet the second requirement in the Listing.

### 4.    Residual Functional Capacity (RFC)/Treating Physician

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other

limitations.  20 C.F.R §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d

145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y.

1990)).  An ALJ must specify the functions plaintiff is capable of performing, and

may not simply make conclusory statements regarding a plaintiff's capacities.

*Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588

(2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*,

666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  RFC can only be established when there is

substantial evidence of each physical requirement listed in the regulations.  *Id.*  The

RFC assessment must also include a narrative discussion, describing how the evidence

supports the ALJ's conclusions, citing specific medical facts, and non-medical

evidence.  *Trail v. Astrue*, 5:09-CV-1120, 2010 U.S. Dist. LEXIS 100595 at *16, 2010

WL 3825629 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96-8p,

1996 SSR LEXIS 5 at *19, 1996 WL 374184, at *7).

    In this case, plaintiff argues that the ALJ's RFC finding was incorrect because

he did not provide a function-by-function analysis and did not properly address

plaintiff's exertional or non-exertional limitations. (Pl.'s Brief at 19–21).

### a.    Physical Limitations (exertional)

    While a treating physician's opinion is not binding on the Commissioner, the

opinion must be given controlling weight when it is well supported by medical

findings and not inconsistent with other substantial evidence.  *See Veino v. Barnhart*,

312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's

opinion is contradicted by other substantial evidence, the ALJ is *not* required to give

the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

The ALJ must, however, properly analyze the reasons that the report is rejected.  *Id.*

An ALJ may not arbitrarily substitute his own judgment for competent medical

opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

In making the RFC determination, the ALJ considered the doctors' reports and

indicated the degree of weight that he was giving each report.  Plaintiff argues that the

ALJ should have given greater weight to the opinions of treating physicians Dr.

Steinman and Dr. Gardezi, who each found that plaintiff could not participate in work

activities.  (*See* T. 305–07).  The ALJ noted that Dr. Steinman completed a fill-in-the-

blanks checklist form, indicating that claimant was unable to participate in any work

activities for two to four months due to chronic back pain, a history of coronary artery

disease, post traumatic stress disorder and depression, and traumatic brain injury.  (T.

305–06).  The ALJ also noted that Dr. Steinman's opinion was that, while the

limitation would end in two to four months, the impairments would continue for one

year or more.  *Id.*

Dr. Gardezi also completed a fill-in-the-blanks form, indicating that plaintiff

was unable to participate in work activities, but based this determination on his

diagnosis of anxiety, depression, seizures, hypothyroidism, and social issues.  (T.

307).  The ALJ noted that the assessments did not indicate what period of time was

considered in making each assessment, and that the assessments were not supported

by narratives or medical evidence.  (T. 19).  The ALJ also noted that Dr. Steinman's

form was dated October 23, 2007, and Dr. Gardezi's form was dated October 29,

2007, which dates are more than a year after the expiration of her insured status.  (T. 19).

### b.    Mental Impairment (non-exertional)

An entire section of the ALJ's decision discussed plaintiff's non-exertional, mental impairment.  While it is true that this part of the ALJ's decision is devoted to determining whether plaintiff's mental impairment meets the Listings, the end of the section he states that "the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis."  (T. 15).

The ALJ noted that despite plaintiff's allegation that her bipolar disorder caused her hands to shake uncontrollably and prevented her from sitting still or concentrating, plaintiff admitted that, prior to the expiration of her insured status, she maintained her household, cared for her dogs, dressed, groomed, and bathed herself, made simple meals, shopped for groceries, did laundry, dishes, and vacuumed.  (T. 15).  The ALJ also considered that plaintiff attended church three times a month, and testified that she did not have a problem getting along with others.  (T. 17).  This is further supported by medical evidence.  For example, Dr. Wulff indicated on a report dated October 2, 2006, that plaintiff had "normal language testing for expression, comprehension, repetition, and testing," but did not cooperate for memory tests.  (T. 194).  Thus, it is clear that the ALJ did consider plaintiff's mental impairment, including her bipolar disorder, in making the RFC determination.  The ALJ's RFC determination is supported by substantial evidence.

### 5.   **Credibility**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments could reasonably be expected to produce the pain or other symptoms alleged.  20 C.F.R. § 416.929(b).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.  *Id.* § 416.929 (c)(1).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location,

duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 416.929(c)(3)(I)–(vii).

In this case, the ALJ found that plaintiff's impairments could reasonably be expected to cause her alleged symptoms, but concluded that plaintiff's statements regarding the intensity, persistence, and limiting effects of these symptoms were not credible to the extent that they are inconsistent with the light work RFC. (T. 16).  The ALJ later noted that plaintiff's fear that she risks hurting herself or others if she works with her seizure disorder could be "virtually eliminated" by strictly complying with her medication regimen.  (T. 18).  In addition, as has been noted above, the medical records contain numerous references to plaintiff's noncompliance with medication as demonstrated by blood tests.  These blood test results directly conflicted with plaintiff's statements to doctors that she was taking her antiseizure medication as prescribed.

In addition, plaintiff's testimony contradicts her claim of disabling symptoms. Plaintiff testified that prior to the expiration of her insured status, she daily walked around, watched television, prepared meals, took her dogs outside, and showered.  (T. 38–39).  She also testified that she dressed and groomed herself, did her own laundry, prepared her own meals, washed her dishes, and vacuumed her apartment.  (T. 40–41).

Plaintiff testified that she attended church three times per month and pursued hobbies that include quilting and liquid embroidery to paint pictures on pillowcases.  (T. 41, 44–45).

This substantial evidence supports the ALJ's conclusion that plaintiff is not completely credible as to the intensity, persistence, and limiting effects of her alleged symptoms.  Thus, the ALJ's credibility finding is supported by substantial evidence.

### 6.   **Vocational Expert**

If a plaintiff's non-exertional impairments[5] "significantly limit the range of work" permitted by the plaintiff's exertional limitations, then the ALJ may not use the Medical-Vocational Guidelines exclusively to determine whether plaintiff is disabled. *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986).  A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations.  *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983).

In the section discussing the Medical Vocational Guidelines, the ALJ discussed the need to determine how plaintiff's additional limitations eroded the unskilled light occupational base.  (T. 20).  Thus, the ALJ consulted a vocational expert to testify whether jobs existed in the national economy for an individual with the plaintiff's age, education, work experience, and residual functional capacity.  (T. 20).  The vocational

---

[5] In addition to non-exertional impairments, any impairment that significantly reduces the range of work that a plaintiff can perform may create the need for a vocational expert.  Such impairments, as stated in the regulations, may be mental, postural, or environmental.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e).

expert testified that plaintiff would have been able to perform the requirements of representative occupations such as assembler, laundry worker, and packer.  (T. 20). The vocational expert also testified that there are 400,000 light, unskilled and 90,000 sedentary unskilled jobs in the region that the plaintiff could perform given her restrictions in her residual functional capacity.  The ALJ thus fulfilled his responsibility to consider plaintiff's particular impairments in making the determination that plaintiff was not disabled.  This finding was supported by substantial evidence.

      **WHEREFORE**, based on the findings above, it is

      **RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and the complaint be **DISMISSED IN ITS ENTIRETY.**

      Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: July 13, 2011

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**